UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**ERIC ANTHONY,**

Defendant.

**REPORT and RECOMMENDATION**

24-CR-6074-CJS-MJP

**APPEARANCES**

| | |
|---|---|
| **For the Government:** | Nicholas Cooper<br>U.S. Attorney's Office - Buffalo<br>Federal Centre<br>138 Delaware Avenue<br>Buffalo, NY 14202 |
| **For Defendant:** | Jeffrey L. Ciccone<br>Federal Public Defender<br>28 East Main Street<br>Suite 400<br>Rochester, NY 14614 |

**Pedersen, M.J.**

### PRELIMINARY STATEMENT

Currently pending before me is a motion for a judicial determination pursuant to 18 U.S.C. § 4241 as to whether Eric Anthony ("Defendant") is competent to stand trial. (ECF No. 17.) For the reasons explained below, I report and recommend that Defendant be found currently incompetent to stand trial, a conclusion with which the government agrees. (*See* ECF No. 42.)

1

## FACTUAL BACKGROUND

Defendant has been charged in a three-count indictment with the following: (1) threatening to assault or murder a federal law enforcement official; (2) interstate communication threatening to injure a person; and (3) possession of a firearm in furtherance of a crime of violence. (ECF No. 7.) Specifically, Defendant sent an email from the State of New York to "atftips@atf.gov" in the District of Columbia in which he threatened to assault and murder Special Agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. (*Id.*)

On July 25, 2024, defense counsel filed a written motion requesting that I order a psychiatric or psychological examination of Defendant pursuant to 18 U.S.C. § 4241(b) and a mental competency hearing pursuant to 18 U.S.C. § 4142(a). (ECF No. 17.) The government did not oppose the motion for a competency hearing (Minute Entry for Proceedings held on July 26, 2024, ECF No. 19), but disagrees that Defendant lacks competency to stand trial. For the reasons stated in Defendant's attorney's affirmation (ECF No. 17), I granted the request and ordered a psychiatric examination of Defendant pursuant to 18 U.S.C. § 4241(b). (ECF No. 20, July 29, 2024.) I found reasonable cause to believe that Defendant could be suffering from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him and to assist properly in his defense. After my order, the United States Marshal's Service transported Defendant for evaluation. Ashley Jenkins, Psy. D., HSP, Forensic Psychologist, evaluated Defendant at the Metropolitan Detention Center in Brooklyn, New York ("MDC

2

Brooklyn") from August 27, 2024 through October 10, 2024, and issued a written report regarding Defendant's competency, dated October 23, 2024. (Competency to Stand Trial Evaluation prepared by Dr. Jenkins ("Jenkins Report") at 2, Oct. 23, 2024, ECF No. 27 (sealed).)

At a status conference held on November 5, 2024, Defendant advised that he intended to contest Dr. Jenkins's findings that he was competent to stand trial on the basis that there existed conflicting medical information from other medical professionals. (Minute Entry for Proceedings, November 5, 2024, ECF No. 29.) I scheduled a competency hearing to provide Defendant with the opportunity to challenge Dr. Jenkins's evaluation. Thus, I afforded Defendant "an opportunity to testify, to present evidence, to subpoena witnesses … and to confront and cross-examine witnesses" at the hearing pursuant to 18 U.S.C. § 4247(d).

Defense counsel submitted an evaluation from Gretchen N. Foley, MD FAPA, a forensic psychiatrist, dated January 5, 2025, which included a detailed report ("Foley Report"). (ECF No. 44 (sealed); Transcript of Proceedings 94:2–11, Jan. 16, 2025, ECF No. 40.)

I held a competency hearing on January 16, 2025, during which the government called Dr. Jenkins as a witness and Defendant called Dr. Foley as a witness. (Minute Entry of Proceedings, January 16, 2025, ECF No. 33.) At that hearing, Defendant indicated that he wanted to take the stand to personally testify and I scheduled a continued hearing to take place on January 21, 2025. (*Id.*)

On that later date, Defendant took the stand and his counsel, counsel for the government, and I all posed questions to him. (Minute Entry of Proceedings, January 21, 2025, ECF No. 34.) I excused Defendant from the stand over his objections as he had testified for approximately one hour and fifteen minutes and I believed I had sufficient evidence to issue this report and recommendation. (*Id.*) The government thereafter indicated that it changed its position and conceded incompetency. (*Id.*)

The government submitted post-hearing briefing regarding the competency proceedings and asserted that "this Court should find the defendant not presently competent to proceed to trial and assist in his defense." (Gov'ts Post-Hearing Briefing at 1, ECF No. 42.)

At Defendant's request I also considered a letter from Defendant to me, dated July 31, 2024 (ECF No. 23 (sealed)), a set of undated notes from the competency hearing (ECF No. 36 (sealed)), his handwritten notes dated January 16, 2025[1], regarding the competency hearing (ECF No. 38 (sealed)), and an undated letter from Defendant to Justice Charles A. Schiano, Jr. (ECF No. 39 (sealed)).

## DISCUSSION

A court must declare a criminal defendant incompetent to stand trial if it finds "by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). The determination of

---

[1] These are incorrectly dated "01/16/2024."

competency turns on whether the defendant has "(1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and (2) a rational as well as factual understanding of the proceedings against him." *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*)) (internal quotations omitted). In assessing competency, "the district court may rely on a number of factors, including medical opinion and the court's observations of the defendant's comportment." *Id*. at 411 (citing *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir. 1990)).

In concluding that Defendant is currently incompetent to stand trial, I rely principally upon the testimony of Dr. Foley, her written report, Defendant's testimony during the hearing, my own observations of Defendant, the four documents he asked me to consider, and, to a lesser extent, Dr. Jenkins's report and testimony as explained below.

### *Dr. Ashley Jenkins*

I turn first to Dr. Jenkins's October 2024 report and her hearing testimony, which I partially credit. As for her qualifications and experience, Dr. Jenkins has worked as a forensic psychologist since 2018 and is licensed to practice psychology in New York State. (Tr. 6:17; 7:19–8:8.) She works for MDC Brooklyn, which is part of the United States Department of Justice Federal Bureau of Prisons, and is an adjunct professor at John Jay College of Criminal Justice. (*Id*. 6:10–14; 6:25–7:3.) Dr. Jenkins has conducted approximately 115 to 130 competency determinations over her career. (*Id*. 9:2–4.)

Prior to issuing her report, Dr. Jenkins interviewed Defendant on several occasions for a total time of approximately 7 hours, outside of testing. (*Id*. 10:24–11:3; 22:22–23:2; Jenkins Report at 2, ECF No. 27.) She administered the written version of the Minnesota Multiphasic Personality Inventory-2-Restructural Form (MMPI-2-RF), which measures "personality characteristics, psychological adjustment, and response bias." (Jenkins Report at 7; Tr. 21:2–23.) Dr. Jenkins reviewed certain of Defendant's medical records and records relating to the pending prosecution. (*Id*. at 2.) She also spoke with Defendant's family, Defendant's attorney, Jeffrey Ciccone, and engaged in an email exchange with Assistant United States Attorney Nicholas Cooper. (Jenkins Report at 2; Tr. 18:18–19:4.) Additionally, she listened to jail calls made by Defendant and spoke to his unit officer at MDC Brooklyn. (Tr. 19:5–20:25; 48:3–23.)

In her detailed written report, Dr. Jenkins opined that Defendant suffers from schizoaffective disorder, currently in partial remission.[2] (Jenkins Report at 8, 9, 13; Tr. 26:20–27:15.) However, she indicated that "[i]t is likely his mood and psychotic symptoms will return at some point if [Defendant] continues to decline psychotropic intervention and mental health treatment." (Jenkins Report at 13.) The report reflects a careful evaluation of Defendant's ability to understand the nature and consequences of the proceedings against him and ability and willingness to assist

---

[2] During her testimony, Dr. Jenkins clarified that on page 8 of her report under the diagnosis heading she wrote F25.1 "schizoaffective disorder currently in remission," but she indicated there was a typo because it should read "currently in partial remission." (Tr. 26:20–27:15.)

6

properly in his defense at the time Dr. Jenkins wrote the report. (*See generally id.*)

During her testimony, Dr. Jenkins explained that she specified that Defendant was in "partial remission" "because [she] believe[d] that he was experiencing some sadness, some depression, which is some of the symptoms for [schizoaffective] disorder . . . the psychosis part is the part that [she] did not see." (Tr. 27:17–28:9.) She testified that her opinion at the end of observing Defendant was that he "was competent to stand trial" and that he "was able to assist his attorney in defending him." (*Id.* 30:5–22.)

### Dr. Gretchen Foley

I next consider Dr. Foley's January 5, 2025, report and her testimony, which I credit more than Dr. Jenkins's because Dr. Foley evaluated Defendant more recently and, having witnessed Defendant's state of mind firsthand as discussed below, appears to more accurately reflect Defendant's current mental state.

With respect to qualifications and experience, Dr. Foley is a forensic psychiatrist who is licensed to practice psychiatry in New York and Ohio and is board-certified by the American Board of Psychiatry and Neurology both in general and forensic psychiatry. (Tr. 99:16–23.) She has worked in the Forensic Unit at Rochester Regional Hospital since 2014, performs private forensic work, and teaches at the University of Rochester. (*Id.* 94:2–11; 98:14–20.) She estimated that she has performed "several hundred" competency evaluations. (*Id.* 95:22–25.)

Dr. Foley interviewed Defendant in the presence of his counsel on July 12, 2024, and December 16, 2024, for a total time of approximately three and a half hours.

7

(Foley Report at 1, ECF No. 44.³) Dr. Foley reviewed Defendant's legal records and certain of his medical records. (*Id.* at 1–2.) She testified that she reviewed Dr. Jenkins's report. (Tr. 102:1–9.) She also considered collateral sources for her report such as information gathered by the BOP psychological services from Defendant's family. (Foley Report at 4.)

In her written report, Dr. Foley opined that Defendant "suffers from a mental disease (Schizoaffective Disorder, Bipolar Type) which is impairing his ability to adequately assist in his own defense. He lacks capacity to stand trial at this time." (*Id.* at 10.) Regarding her December 16, 2024, interview with Defendant she indicated that at the time Defendant

> was extremely irritable, labile, and easily agitated. His thought process was grandiose and illogical, and he was perseverating on irrelevant facts and unable to take feedback from Mr. Ciccone that these facts were not viable in terms of a defense. He appeared actively paranoid about both [Dr. Foley] and counsel.

(*Id.* at 6.) Dr. Foley indicated that Defendant "understands the roles of the players in the Court" but believed that Mr. Ciccone was "railroading" him and that Defendant stated his intent to try to fire him. (*Id.* at 8.) Dr. Foley also stated that "[b]ecause his level of distrust is so high, he is unable to form an effective relationship with Mr. Ciccone" and that Defendant "would struggle to form an effective partnership with any counsel at this juncture." (*Id.*) She indicated that she believed Defendant "factually understands his charges and the process for moving forward, however he

---

³ Dr. Foley's report does not contain page numbers. The Court references page 10 because the quoted language appears on the 10th page of that report.

is unable to rationally use this information to form a coherent defense strategy." (*Id.* at 10.)

During Dr. Foley's testimony, she reiterated her opinion that Defendant lacks capacity to stand trial. (Tr. 104:16–23.) She testified as follows:

> The biggest impediments right now, I believe, are related to the same diagnosis that Dr. Jenkins gave him: Which is schizoaffective disorder, the bipolar subtype. He still is quite paranoid and guarded. He's very rigid in his thought process. He's inflexible, not able to take feedback well or to consider what's being offered to him in terms of advice. He's also quite irritable and labile, at least when we met. All of this causes me concern in terms of his ability to work with [defense counsel].

(*Id.* 104:21–105:12.) She further testified that Defendant used the term "railroading" in relation to Dr. Foley and Mr. Ciccone indicating that Defendant "believes that [they] are, you know, deliberatively trying to hold him back or do him harm in some way." (*Id.* 112:25–113:20.) She testified that during her second interview of Defendant, when Mr. Ciccone tried to speak to him about the facts of his case, Defendant "just kept arguing about things that just didn't matter, weren't relevant and actually probably would be detrimental to his case if it were to go in front of a jury." (*Id.* 128:16–129:10.)

She further testified that she applies

> a two-prong test which is factual and rational and then [she assesses Defendant's] ability to assist with counsel. So, I think of that — that's kind of how in my mind I separate those things. Though certainly there are people who have neither rational nor factual understandings.
>
> In this situation, Mr. Anthony can say the facts of his case. He can tell me what he's charged with. He knows the approximate penalty. He knows who [Mr. Ciccone is], what [his] job is. It's being able to use those facts in a rational manner and to use those facts in a rational manner with [Mr. Ciccone] that he's struggling.

9

(*Id*. 131:4–22.)

Dr. Foley explained that she believed her opinion about whether Defendant lacked capacity to stand trial differed from Dr. Jenkins, in part, because Dr. Jenkins was not able to observe the interactions between Defendant and Mr. Ciccone, which Dr. Foley testified were "very problematic." (*Id*. 123:15–124:8.) In addition, Dr. Foley testified that "more time has passed. [Defendant's] in a different head space now than he was a couple of months ago or even probably yesterday, as we all are. And I had the benefit of additional information that they did not have" meaning the two meetings that Dr. Foley had with Defendant in July and December. (*Id*. 124:9–12; 138:9–139:6.)

Dr. Foley also testified that Defendant "rather adamantly denies having any psychiatric problems . . . despite the fact that there's a hospitalization on record" which is "indicative of his lack of insight at this time." (*Id*. 110:12–23; 111:8–18.)

### *Defendant's testimony*

Defendant took the stand on January 21, 2025, against Mr. Ciccone's advice. (Transcript of Proceedings 193:11–17, Jan. 21, 2025 ("Jan. 21 Tr."), ECF No. 41.) I made it clear that I believed that "the only relevant issue . . . in this case is whether [Defendant is] able to assist in the preparation of a defense because it seems both experts agreed that [Defendant] had an understanding of the proceedings and the factual nature of the allegations against [him]." (*Id*. 201:25–202:5.)

In testifying that he disagreed with a diagnosis of psychosis by Dr. David R. Flaherty prior to his evaluations by Drs. Jenkins and Foley, Defendant "denied that

it was schizophrenia and [ ] claimed it was electronic harassment [and he] stand[s] strongly by that opinion." (*Id.* 238:11–240:2.) When asked what he meant by "electronic harassment" Defendant responded as follows:

> A   It, it — piping voices to the head, you know, that's what I mean, via radio signals and even other types of signals.
> Q   Who's —
> A   Wireless signals.
> Q   Who's piping signals to your head?
> A   As I claimed back in 2022 with Flaherty, I claimed that I guess I just claim, if, if I'm correct, the military.
> Q   Okay. And so do you think that that was the cause of whatever problem you were having, it was the signals that were being piped into your head, not any kind of mental issue from you?
> A   Yes, correct.

(*Id.* 240:3–16.) When further questioned about Dr. Flaherty Defendant testified as follows:

> Q   But you did tell him that you were hearing voices, so you did have symptoms of psychosis, right?
> A   I mean, psychosis means — is that a symptom of psychosis of hearing voices or auditory hallucinations, but, but I don't agree with psy — the actual diagnosis of psychosis at all but I guess you saying that a symptom, I guess it's a symptom of it but I don't agree with psychosis.
> Q   I understand you disagree with the conclusions.
> A   I mean the auditory hallucinations weren't hallucinations at all because I was not hallucinating at all so I guess I...
> Q   Okay. I'm sorry. I guess maybe I'm not understanding what you mean. So you said that you were hearing the voices —
> A   Hearing.
> Q   — that they were piping into your head?
> A   Yes, hearing voices but not agreeing that they were hallucinations nor psychosis, I do not agree with that at all.
> Q   Okay. What — why were the, why did you think the voices being piped in your head were not an hallucination? What did you think they were?
> A   Because they obviously were not in, I said, they, they were electronic voices and the way they were — the time and when they were appearing in my head and, you know, and how, how they sounded and what, you know.

11

> Q      I'm sorry. I cut you off. Are you saying that they were not hallucinations because they were real?
> A      Basically, yes. They, they really weren't hallucinations. I wasn't psyco, psychotropically going through anything like, you know, I wasn't mentally, you know, you know what I'm trying to say, like, like mental illness or decline or, you know, just it was just straight up piping of voices in my head and I knew it and I just.
> Q      Okay. So, since they really were piping voices into your head, it couldn't have been a hallucination?
> A      Yes, correct, that's what I'm trying to say, or I'm saying.

(*Id.* 244:3–245:7.)

However, when I asked Defendant whether he was still hearing these voices he testified that he had not heard them since 2022 when he was medically arrested due to an altercation with his father. (*Id.* 247:15–248:1; 294:25–296:4.) Moreover, despite both Drs. Jenkins and Foley opining that he would benefit from medication, Defendant disagreed that he needed it and does not want to take any. (*Id.* 252:14–254:4.)

Defendant further testified that he thought his attorney, Mr. Ciccone, was "coerced or even threatened or pressured to or bribed to" railroad him by "Gretchen Foley . . . the corrupt Rochester local government and New York State government." (*Id.* 263:7–264:9.) When Mr. Ciccone asked Defendant what the end goal would be for him and Dr. Foley railroading him, Defendant testified as follows:

> A      Well, I know from Foley and possibly coconspirators, unknown coconspirators, to me that they want me to have the stiffest penalty and, also, the basically to put me on medicine and drug me up and basically, you know, neurologically fry my brain and they keep me looped out when I'm actually am competent and I'm cognitively functional and then just, you know, that's what I mean. And also to, to, present lies to media or my family and embarrass me and embarrass my family and people of my ilk just that, that's what I meant by railroading.

12

> Q  Why would anybody want to do that to you?
> A  Because government conspiracies and dark government conspiracies and conspiracies and ulterior motives, basically.
> Q  Do you think the government is conspiring against you?
> A  Sects of the government, certain sects of the government, yes.
> Q  Why?
> A  Because the, you know, they don't, I believe that they don't, they don't like firearms. They don't want people to possess firearms and they don't want people to know the conspiracy of the CIA using the ATF to, to slowly disarm Americans and institute Communism, Authoritarianism and Marxism and Socialism and all the other bad-isms that aren't Capitalism and even institute crony Capitalism which we basically are under crony capitalism and things like that.
> Q  You know what they're up to?
> A  Basically, yes.
> Q  And they're trying to silence you?
> A  Basically, yes.

(*Id.* 281:5–282:13.) He also testified that Mr. Ciccone was lying to him, his brother, and his father "off camera and off recorded phone call [sic] to the judge." (*Id.* 276:24–278:12.)

With respect to Dr. Foley, Defendant further testified, in part, as follows:

> I suspect that based on how she was lying and how she presented herself and what she was bringing and saying during her false testimony is that I honestly believe she is a CIA highly trained professional liar and based off — her military experience in the Air Force kind of confirms it for me because I know that the military, they, they love railroading military veterans, government and also civilian people, civilians whenever they have knowledge or experience things from classified black, black project military operations.

(*Id.* 285:1–11.)

Defendant's hearing testimony reflected his understanding of the differing roles of the courtroom participants, including the judge, the prosecutor, and defense counsel. While he appeared to have some confusion regarding the exact statute under

13

which he was charged for possession of a firearm in furtherance of a crime of violence, he seemed to understand the source of his confusion—namely that he had not seen the exact statute in some time and was mistaken about it. Otherwise, Defendant was able to discuss the nature of the charges against him, generally discuss the applicable burden of proof, and the general procedures applicable to a criminal trial.

On the other hand, his testimony reflected that he has heard voices in the past, that he disagrees with the opinions of Drs. Jenkins and Foley that he would benefit from medication, that Dr. Foley was railroading him and was acting on behalf of the CIA, and, importantly, that his current counsel, Mr. Ciccone, has somehow been persuaded into railroading him.

At the conclusion of Defendant's testimony, the government changed its position to concede incompetency. (*Id*. 302:5–7.)

### *Defendant's other submissions to the Court*

As previously indicated, Defendant requested that I review the following in connection with this report and recommendation: a letter from Defendant to me, dated July 31, 2024 (ECF No. 23 (sealed)), a set of undated notes from the competency hearing (ECF No. 36 (sealed)), his handwritten notes dated January 16, 2025, regarding the competency hearing (ECF No. 38 (sealed)), and an undated letter from Defendant to Justice Charles A. Schiano, Jr. (ECF No. 39 (sealed)).

I reviewed these documents and find that they support a finding of incompetency. Defendant's 24-page July 31, 2024, letter to me requests that I fire his lawyer, Mr. Ciccone, in part because Mr. Ciccone was "purposefully neglecting

14

[Defendant] . . . to the point of tetering [sic] on railroading [Defendant]." (ECF No. 23 at 1.) It also discusses many of the issues he addressed during his testimony. His handwritten notes from the January 16, 2025, competency hearing are 28 pages in length and appear to be Defendant's reactions to Dr. Foley's report. (ECF No. 36.) It also discusses many of the issues addressed when he testified. For example, Defendant discussed hearing voices, accuses Dr. Foley of lying, and asks me to find her "guilty of perjury/conspiracy to railroad. [sic]" (*Id*.) Defendant's handwritten notes from the January 16, 2025, competency hearing, which are 14 pages in length, largely address the expert's testimony and also discuss issues about which he testified. (ECF No. 38.) For example, Defendant once again talks about his alleged "electronic harassment" and how it was a fact that it happened. (*Id*. at 2.) He also wrote the following:

> From my opinion and analysis (and past history of actual railroading in court), I highly suspect most of the "doctors" who claim(ed) I am not competent or experience "psychosis", [sic] in fact (or may) have some form of "political vitriol" or "political vendetta" or "political bias" based from [sic] Dr. David Howard Flaherty's analysis/report/diagnosis. But, if not any of the above (including government conspiracy/railroading), then I conclude it may be due to a "lack of understanding" or a bit of both.

(*Id*. at 4.) Defendant also suggests that Dr. Foley was trained by the CIA to make her a good liar, "considering her MIL/AirForce experience." (*Id*. at 8.) Further, with respect to Dr. Jenkins, Defendant wrote "I highly suspect (due to the nature of my case) that U.S. gov [sic] purposely and maliciously tasked her w/ lying and railroading me (evaluations and testimonials)." (*Id*. at 11.) Finally, I reviewed Defendant's undated 17-page typed letter to Justice Charles A. Schiano, Jr. titled "Letter of

15

Reconsideration" in which Defendant, among other issues, expresses his disagreement with Dr. Flaherty's diagnosis, calls Dr. Flaherty a liar, and asks Justice Schiano to "contact the FBI & request that they completely clear [his] name of any mental institution (psych ward) visit & clear [his] name of being '<u>adjudicated mentally defective</u>'"? [sic]." (*Id.* at 13–14, emphasis in original.)

I find that Defendant's writings further demonstrate his lack of competency to stand trial. They track much of what Defendant addressed during his testimony. I particularly find his two sets of notes written at the time of the competency hearing to be instructive as they are very recent and show his irrational thinking such as his belief that the government is trying to harm him through the doctors who evaluated him.

In sum, considering Dr. Jenkin's testimony and report, and to a greater extent Dr. Foley's testimony and report, Defendant's own testimony, and my own observations of Defendant I find by a preponderance of the evidence that Defendant is presently suffering from a mental disease and defect—specifically Schizoaffective Disorder, Bipolar Type—that renders him unable to assist properly in his defense.

## CONCLUSION

For the forgoing reasons, I report and recommend that Defendant be found not competent to stand trial and that he be committed to the custody of the Attorney General for a reasonable period, not to exceed four months, to determine "whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceeding to go forward." 18 U.S.C.§ 4241(d)(1).

Pursuant to 28 U.S.C. § 636(b)(1), I hereby

**ORDER**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and, as applicable, Local Rule of Criminal Procedure 59(b) or Local Rule of Civil Procedure 72(b). **The parties are directed to review the applicable Local Rule of Civil or Criminal Procedure.**

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

**Failure to comply with the provisions of the Local Rules of Criminal or Civil Procedure may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

Dated:  May 1, 2025
        Rochester, NY

_____
MARK W. PEDERSEN
United States Magistrate Judge